# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **RICHARD GITTER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:07-CV-1029-VEH** |
| | ) |
| **CARDIAC & THORACIC** | ) |
| **SURGICAL ASSOCIATES, LTD.,** | ) |
| **and ROCKINGHAM MEMORIAL** | ) |
| **HOSPITAL,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Richard Gitter ("Gitter") initiated this lawsuit in the Circuit Court of Jefferson County on April 5, 2007.  (Doc. #1 ¶ 1).  On June 1, 2007, Defendants Rockingham Memorial Hospital ("RMH") and Cardiac & Thoracic Surgical Associates, Ltd. ("CTSA") removed the litigation to this court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  (Doc. #1 ¶ 10).

Subsequently, RMH and CTSA each filed a separate Motion to Dismiss or Alternatively to Transfer (Docs. #6, #7) (the "Motions") and collectively, a Joint Brief (Doc. #7) in support of such Motions on July 2, 2007.  On July 3, 2007, the

court entered an order (Doc. #10) setting deadlines for additional briefing related to these Motions.  Consistent with the court's briefing order, Plaintiff Richard Gitter ("Gitter") filed his response in opposition (Doc. #13) on July 17, 2007.  Defendants filed their joint reply (Doc. #20) on July 30, 2007.

Additionally, on July 10, 2007, Gitter filed a Second Amended Complaint. (Doc. #12).  In his Second Amended Complaint, Gitter asserts five (5) separate counts relating to his dealings with Defendants over his provision of surgical services for the benefit of RMH as an employee of CTSA.  (*See generally* Doc. #12).  Gitter's claims against Defendants specifically include breach of contract (count one); fraud, misrepresentation and deceit (count two); fraudulent suppression (count three); fraudulent inducement to enter a contract (count four) and conspiracy (count five). (Doc. #12 at 6-9).

The substance of Defendants' Motions is that this court lacks personal jurisdiction over them and alternatively that venue is improper.  In terms of relief, Defendants seek either a dismissal without prejudice due to lack of personal jurisdiction or improper venue, or alternatively a transfer of the case to the Richmond Division of the Eastern District of Virginia.  The court held a hearing on the Motions on Wednesday, August 15, 2007, beginning at 3:00 p.m. in Courtroom 6A of the Hugo Black U.S. Courthouse, 1729 5th Avenue North, Birmingham, Alabama, 35203.

(Doc. #10 at 2).

The court allowed the parties to present testamentary evidence at this hearing (*id.*), but neither side elected to do so.   Instead, the hearing was limited to the presentation of oral argument.   Because the court concludes that it lacks personal jurisdiction over both RMH  and CTSA and that venue is proper elsewhere, the Motions are due to granted as to the alternative relief requested by Defendants, and pursuant to 28 U.S.C. § 1406(a), this case is due to be transferred to the Eastern District of Virginia.

## II.    STATEMENT OF JURISDICTIONAL FACTS[1]

### A.    CTSA

CTSA is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Richmond, Virginia.   The practice consists of five surgeons, who practice at hospitals in the Richmond area.   The practice has four offices, also in the Richmond area.   CTSA does not have any office outside Virginia. It does not treat patients in Alabama, does not have any employees

---

[1]In this particular case, the parties have only limited areas of dispute over the jurisdictional facts.   Instead, they disagree over the legal significance of what these facts mean.   To the extent that any of the jurisdictional facts are disputed, the court has stated them in the light most favorable to Gitter.   *See infra*, at 10-11 (citing Eleventh Circuit's *Delong* and *Madara* opinions and explaining burdens and standard of review applicable to personal jurisdiction analysis).

working in Alabama, does not have offices in Alabama, does not have bank accounts in Alabama and does not advertise in Alabama. *See* Affidavit of James Zocco, ¶¶ 2, 4 attached to CTSA's Motion as Exhibit A. ("Zocco Aff.").

### B.   RMH

RMH is an independent nonprofit community hospital located in Harrisonburg, Virginia. Established in 1912, it serves five counties in the northwestern section of Virginia. RMH offers a range of inpatient and outpatient surgical procedures. RMH does not provide medical care in Alabama, does not have any employees working Alabama, does not have offices in Alabama, does not have bank accounts in Alabama, and does not advertise in Alabama. *See* Affidavit of David Grembi, ¶ 4, attached to RMH's Motion as Exhibit A. ("Grembi Aff.").

### C.   RMH seeks to develop a new cardiac surgery program.

In 2006, RMH approached CTSA to assist with the planning, development and administration of a new cardiac surgery program at the hospital in Virginia. Grembi Aff. ¶ 8. CTSA would assist RMH in recruiting two cardiac surgeons. Both surgeons would be CTSA employees, and have privileges and practice medicine at RMH. RMH would have final approval of any physician recommended by CTSA. Grembi Aff. ¶ 11. CTSA would play an integral role in developing, training, and establishing an office practice to support these two physicians. The details and terms of this joint

effort were to be set forth in a written agreement between RMH and CTSA.

**D.    Gitter becomes a potential candidate to head up the proposed cardiac surgery program.**

Gitter, a cardiothoracic surgeon in Birmingham, Alabama, became a candidate for primary cardiac surgeon and medical director of the proposed cardiac surgery program.  He was not independently identified or selected by CTSA to be a candidate. Instead, Gitter confirms that in 2005 he contacted and submitted his name and curriculum vitae ("CV") to Charles Franc of Charles Franc & Associates, a consulting firm in the field of cardiology, which had been retained by RMH to assist with the development of the cardiac surgery unit (but not retained specifically to locate or recruit surgeons).  Doc. #13 at Ex. A ¶ 3;  Grembi Aff. ¶ 5. This consulting firm passed Gitter's CV along to RMH.  Grembi Aff. ¶ 8.  In the fall of 2006, CTSA contacted Gitter by telephone about the prospective job opportunity in Virginia.  Doc. #13 at Ex. A ¶ 4.

**E.    CTSA contacts Gitter and Gitter travels to Richmond, Virginia to interview with CTSA surgeons**.

RMH forwarded Gitter's CV to Tiffany Lange, the Executive Administrator at CTSA, in September 2006.  *Id.* ¶ 8; Zocco Aff. ¶ 8. CTSA then contacted Gitter. Gitter came to Richmond, Virginia to interview with the CTSA surgeons in early October 2006.  Zocco Aff. ¶ 10.  However, CTSA later informed Gitter that it could

not continue with the interview process because Gitter had declined to provide references and be observed in surgery.  *Id.* ¶ 13, Affidavit of Chiwon Hahn, M.D. at ¶ 8, attached to CTSA's Motion as Exhibit B.  ("Hahn Aff.").

### F.    A CTSA partner travels to Birmingham to observe Gitter.

In late November of 2006, CTSA contacted Gitter to see if he was still interested in the opportunity to practice in Virginia. Zocco Aff. ¶ 14.  Gitter again expressed interest in the position. *Id.*  Arrangements were made for Chiwon Hahn, MD ("Dr. Hahn"), one of the CTSA partners, to go to Birmingham to observe Gitter in surgery.  Because Gitter is not licensed to practice medicine in Virginia and does not have privileges at any Virginia hospital, the only opportunity for observation was in Alabama.  Zocco Aff. ¶ 12; Hahn Aff. ¶ 9.  Dr. Hahn went to Alabama in December, 2006 for the sole purpose of observing Gitter in surgery.  Hahn Aff. ¶ 12.  Dr. Hahn indicates that to the best of his recollection, no details of the potential employment relationship were discussed during his visit to Birmingham.  *Id.*  Gitter specifically recalls otherwise that he and Dr. Hahn discussed the "details of [his] potential relationship with CTSA and RMH." (Doc. #13 at Ex. A ¶ 8).  Dr. Hahn was in Alabama for less than a day and spent approximately four (4) hours observing Gitter in surgery.  *Id.*  ¶¶ 11-13.

### G.    Gitter travels to Harrisonburg, Virginia to interview.

On February 12, 2007, Gitter came to Harrisonburg, Virginia to interview at RMH.  Grembi Aff. ¶ 13.  One member of RMH's interview panel, Lori Robertson, RN, had a scheduling conflict and was unable to meet with Gitter in Harrisonburg. *Id.* ¶ 14.

### H.    RMH sends previously absent panel member, Lori Robertson, to Birmingham to meet with Gitter and his wife.

On or about January 29, 2007, RMH sent Ms. Robertson to Birmingham. Grembi Aff. ¶ 4.  Ms. Robertson was in Alabama for one day and met with Gitter and his wife for dinner.  Affidavit of Lori Robertson, ¶¶ 6-7, attached to RMH's Motion as Exhibit B.  ("Robertson Aff.")  During this dinner, Ms. Robertson and Gitter discussed RMH, the proposed cardiac surgery program, and Harrisonburg, Virginia. Robertson Aff. ¶ 7.

### I.    RMH and Gitter continue negotiations by telephone and email.

RMH believed that Gitter was a good candidate, and approved the pursuit of an employment arrangement with him.  Zocco Aff. ¶ 18.  A draft employment agreement was sent to Gitter on February 15, 2007.  *Id.* ¶ 19. A confidentiality agreement was sent to him the next day.  *Id.*  The negotiations resulted in numerous iterations of a Non-Shareholder Employment Agreement ("Employment Agreement").

*See* Exhibit C to CTSA's Motion.  Discussions as to the terms occurred by telephone and electronic mail.  Zocco Aff. ¶ 23.  Numerous drafts of the Employment Agreement were exchanged.  *Id.* ¶ 27.

In March 2007, at Gitter's request, CTSA sent him a draft version of the agreement to be entered into between RMH and CTSA concerning the development and administration of the cardiac surgery program at RMH.  This document, entitled Cardiac Surgery Services Agreement ("Services Agreement"), had not been executed by CTSA and RMH.  Zocco Aff.  ¶ 20.

Although CTSA felt that it was close to an agreement with Gitter on several occasions, Gitter repeatedly raised issues, many of which from CTSA's perspective had been addressed and resolved.  *Id.* ¶ 21.  It became apparent to CTSA and RMH that Gitter was not committed to reaching an agreement or to otherwise having the kind of relationship that would be critical to the success of the cardiac surgery program.  *Id.* ¶¶ 21-22.

There were no meetings in Alabama with Gitter or his counsel to negotiate the terms of the Employment Agreement.  *Id.* ¶ 24. The only meetings in Alabama involved the surgery observation by a CTSA surgeon and a dinner interview with an RMH nurse.

**J.     The employment contract contemplates performance and governance in Virginia.**

The alleged Employment Agreement which has given rise to this action contemplates performance and governance in Virginia.  More specifically, Article II of the Employment Agreement provides for performance of the contract in Harrisonburg, Virginia, where it was proposed that Gitter provide surgical services. The Employment Agreement contemplates that Gitter "devote his entire professional time to the affairs of Corporation [CTSA] at such places designated by Corporation in Rockingham County [Virginia] and occasionally in Richmond, Virginia and its nearby counties."

In Article II, Section C, the Employment Agreement requires Gitter to adhere to the laws of Virginia.  Article XX provides that the Employment Agreement "shall be interpreted, construed and governed according to the laws of the Commonwealth of Virginia."  The Employment Agreement indicates a "made and entered" date of March 23, 2007, reflects that Gitter signed it on March 28, 2007, but contains  no signature of Dr. Zocco, as President of CTSA.  At the hearing, the court confirmed that no agents of Defendants had signed the Employment Agreement.[2]

_____

[2]RMH was not a party to the Employment Agreement.

9

## III.   ANALYSIS

### A.   Personal Jurisdiction Generally

"'Personal jurisdiction . . . is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication.'" *Mercantile Capital, LP v. Federal Transtel, Inc.*, 193 F. Supp. 2d 1243, 1247 (N.D. Ala. 2002) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584, (1999)). "The personal jurisdiction requirement recognizes and protects an individual liberty interest.  It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (footnote omitted).

#### 1.   Burdens and Standard of Review

In *Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843 (11th Cir. 1988), the Eleventh Circuit described how the court should evaluate a dispute over personal jurisdiction in the absence of an evidentiary hearing:

> [When] no evidentiary hearing is held, the plaintiff must present only a *prima facie* showing of venue and personal jurisdiction. The facts as alleged in the complaint are taken as true, to the extent they are uncontroverted by defendants' affidavits.  In addition, "[w]hen there is a battle of affidavits placing different constructions on the facts, the court is inclined to give greater weight, in the context of a motion to dismiss, to the plaintiff's version . . . ," particularly when "the jurisdictional questions are apparently intertwined with the merits of the case," as is true in this appeal. *Psychological Resources Support*

> *Systems*, 624 F. Supp. at 486-87.  *See also Vest v. Waring*, 565 F. Supp. 674, 693 (N.D. Ga. 1983) ("All pleadings and affidavits introducing evidence relating to jurisdictional facts are to be construed in the light most favorable to the plaintiff").  Consequently, the facts detailed below, distilled from the complaint and the affidavits of the parties, construe all reasonable inferences in favor of [the nonmovant].

*Delong*, 840 F.2d at 845 (some internal citations omitted); *see also Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) ("[W]here the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff.") (citing *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988)).

Further, when "the defendant submits affidavits contrary to the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction."  *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

Finally, a plaintiff has "established a *prima facie* case [for personal jurisdiction] if the evidence would be sufficient to defeat a motion for a directed verdict[.]"  *See Chalwest (Holdings) Ltd. v. Ellis*, 924 F.2d 1011, 1013 (11th Cir. 1991) (quoting *Morris*, 843 F.2d at 492).  In other words, a court must deny a motion to dismiss for want of personal jurisdiction "if the plaintiff can present plausible

evidence tending to show that the court has jurisdiction." *Chalwest*, 924 F.2d at 1014.

### 2.    Personal Jurisdiction Framework

In *Madara*, the Eleventh Circuit described the two-part framework for evaluating personal jurisdiction challenges under Rule 12(b)(2) of the Federal Rules of Civil Procedure:

> The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis. *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir.1990); *Alexander Proudfoot Co.*, 877 F.2d at 919.  First, we consider the jurisdictional question under the state long-arm statute.  *Cable/Home Communication Corp.*, 902 F.2d at 855; *Alexander Proudfoot Co.*, 877 F.2d at 919.  If there is a basis for the assertion of personal jurisdiction under the state statute, we next determine whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

*Madara*, 916 F.2d at 1514 (citations omitted).

Because Alabama's long-arm provision "authorizes the assertion of personal jurisdiction to the limits of the United States Constitution," Gitter may carry his burden "by demonstrating that personal jurisdiction over [either] Defendant meets the requirements of federal due process.  Due process requires that the Defendant have 'certain minimum contacts' with the forum state and, second that the exercise of jurisdiction over the Defendant does not offend 'traditional notions of fair play and

substantial justice.'" *LaSalle Bank N.A. v. Mobile Hotel Properties, LLC*, 274 F. Supp. 2d 1293, 1297 (S.D. Ala. 2003); *see also Consolidated Development Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).

A plaintiff can either establish general or specific jurisdiction over a defendant to show personal jurisdiction exists. *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310 (1945) (detailing contours of appropriate and inappropriate exercise of personal jurisdiction); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn.8-9 (1984) (acknowledging scholarly distinction made between exercise of "specific" and "general" jurisdiction).  To establish general jurisdiction over a defendant, a plaintiff must demonstrate that the defendant's connection with the forum state is "continuous and systematic." *LaSalle Bank*, 274 F. Supp. 2d at 1297; *see also Sherritt*, 216 F.3d at 1292.

On the other hand, to constitute minimum contacts for the purposes of specific jurisdiction:

> [A] defendant's contacts with the applicable forum must satisfy three criteria:  first, the contacts must be related to the plaintiff's cause of action or have given rise to it; second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws; and third, the contacts must be such that the defendant should reasonably anticipate being haled into court in the forum.

*LaSalle Bank*, 274 F. Supp. 2d at 1297; *see also Sherritt*, 216 F.3d at 1291.  In this case, Gitter takes the position that specific jurisdiction exits over RMH or CTSA; therefore, the court's analysis will not involve cases and concepts relating to general jurisdiction or continuous and systematic contacts.

**B.    The exercise of specific jurisdiction over either RMH or CTSA by this court is improper.**

Gitter has not met his burden of establishing that personal jurisdiction over either RMH or CTSA exists.  *See LaSalle Bank*, 274 F. Supp. 2d at 1296 ("Due process requires, first, that the defendant have 'certain minimum contacts' with the forum state and, second, that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'") (citations omitted).

**1.    Minimum Contacts Criteria**

Within the Eleventh Circuit, "[t]o constitute constitutionally minimum contacts, the defendant's contacts with the applicable forum must satisfy three criteria." *Vermeulen v. Renault*, U.S.A., Inc., 985 F.2d 1534, 1546 (11th Cir. 1993).  As explained by the *Vermeulen* court:

> First, the contacts must be related to the plaintiff's cause of action or have given rise to it.  Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws.  Third, the defendant's contacts with the forum must be such that [the defendant] should reasonably anticipate

14

being haled into court there.

985 F.2d at 1546 (internal quotations and citations omitted).

The exercise of specific personal jurisdiction over RMH or CTSA is not appropriate because the record contains insufficient evidence to support either the purposeful availment or reasonable anticipation factor.[3] Gitter's case involves claims stemming from the negotiations and promises made relating to his Employment Agreement with CTSA.[4] However, a contract alone does not "automatically establish

---

[3]The first *Vermeulen* factor is satisfied because Defendants' contacts with Alabama all relate to Gitter's claims.

[4]As noted in the introduction, Gitter has not only sued Defendants for breach of contract but also for fraud. Gitter argues that the allegations of fraudulent conduct perpetrated upon an Alabama resident satisfy *Vermeulen*'s third factor of the minimum contacts criteria. (Doc. #13 at 14-15). However, the cases that Gitter relies upon are significantly distinguishable as they do not arise in the context of fraud stemming from a purported employment contract to be performed outside of the forum state. *See Calder v. Jones*, 465 U.S. 783, 784 (1994) (affirming exercise of personal jurisdiction over defendants in libel action involving their intentional conduct engaged in outside of forum of writing and editing article, but allegedly causing injuries to plaintiff within forum due to large circulation of magazine in same jurisdiction); *Shrout v. Thorsen*, 470 So. 2d 1222, 1225, 1227 (Ala. 1985) (affirming exercise of personal jurisdiction over defendant in fraudulent loan scheme case perpetrated against plaintiff residing within forum state).

Therefore, *Calder* does not involve any allegations of fraud. As for *Shrout*, this court agrees with the concurring opinion that the language in the majority decision is overbroad. *Id.*, 470 So. 2d at 1226, (Torbert, C.J., concurring specially and Almon, J., joining in special concurrence) ("The majority opinion seems to imply that the mere fact that an out-of-state resident is alleged to have defrauded an Alabama resident gives Alabama courts *in personam* jurisdiction over the out-of-state

sufficient minimum contacts" in the plaintiff's home forum.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985); *see id.* ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Owens v. Superfos A/S*, 170 F. Supp. 2d 1188, 1191 (M.D. Ala. 2001) ("Undoubtedly a single contract by itself is insufficient to establish minimum contacts in a party's forum.").

Various factors, including "prior negotiations and contemplated further consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."  *Burger King*,  471 U.S. at 479.  "'The application of that rule will vary with the quality and nature of the defendant's

---

resident."); *see id.* ("What is actually required is that the out-of-state resident have sufficient contacts with this state to make it fair and reasonable to require him to come to Alabama to defend.") (citations omitted); *see also Lowry v. Owens*, 621 So. 2d 1262, 1266 (Ala. 1993) (recognizing that "mere allegation of purposeful or intentional fraud, standing alone, is not sufficient to establish jurisdiction") (citing to Chief Justice Torbert's special concurrence in *Shrout*).  Additionally and regardless of *Shrout*'s appropriate scope, as the Eleventh Circuit has acknowledged, the application of Alabama law is not necessary in the context of *in personam* jurisdiction analysis.  *See Morris*, 843 F.2d at 492 n.3  ("However, where the forum's courts interpret the forum's long-arm statute to the limits of federal due process, we believe it is not necessary to apply state law; application of the federal *International Shoe* two-part analysis will suffice.").

activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Burger King*, 471 U.S. at 474-75 (citation omitted).

Moreover, while courts have recognized, as Gitter points out, "that specific jurisdiction may arise without the nonresident defendant ever stepping foot upon the forum state's soil or may arise incident to the commission of a single act directed at the forum," *Aeropower, Ltd. v. Matherly*, No. 1:03-cv-889-WKW, 2007 WL 163082 (M.D. Ala. Jan. 18, 2007), *12 (internal quotations and citation omitted), the Eleventh Circuit has cautioned that "[t]he mere 'foot-fall' of the defendant's agents 'on the State's soil' does not in the relevant sense invoke the benefits and protections of the laws of the forum." *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir. 1986) (citations omitted).  Therefore, akin to the *Sea Lift* decision, "this case thus raises the often difficult question of what, beyond the bare contract, must be present to satisfy the minimum contacts rule?" *Id.*, 792 F.2d at 993 (internal quotations and citation omitted).

In support of their Motions, Defendants cite to *Johnston v. Frank E. Basil, Inc.*,

802 F.2d 418 (11th Cir. 1986),[5] in which out of state defendants sought to fill employment opportunities in Saudia Arabia with agreements governed by Saudia Arabian law through advertising in Alabama and sending an agent to Alabama to interview the plaintiff.   Relying upon *Burger King* in part,[6] the Eleventh Circuit concluded that "[s]uch activities do not fall within the realm of purposeful availment of the benefits and protections of Alabama laws." *Johnston*, 802 F.2d at 420.   The

_____

[5]Gitter points out that *Johnston* is not completely on all fours with this litigation, including in particular the two (2) visits by agents of Defendants to Alabama regarding Gitter's prospective employment, Gitter's execution of the Employment Agreement in Alabama (*see* Doc. #13 at 17-18), and Gitter's allegations of fraud discussed *supra*, at n.4.   However, these differences do not address *Johnston*'s overall focus on how a district court should evaluate personal jurisdiction in the context of a dispute arising out of a non-forum employment contract governed by non-forum laws.   Moreover, Gitter has not cited to any binding authority which holds that *in personam* jurisdiction exists in a situation similar to this one or that brings into question the Eleventh Circuit's reasoning in *Johnston*.   Therefore, *Johnston* is controlling authority in this case.

[6]In *Burger King*, the Supreme Court determined that the exercise of personal jurisdiction over an out of state defendant based upon contractual relations with an instate plaintiff was appropriate.   The *Johnston* court distinguished the circumstances of the commercial transaction in *Burger King* from the nature of the relationship before it:

> In *Burger King*, the defendant was found to have "deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise," a business relationship of more complicated dimensions than that of an employer/employee relationship.

*Johnston*, 802 F.2d at 420 n.2.

*Johnston* court further ruled that "these defendants have [not] subjected themselves to the judicial jurisdiction of Alabama by the simple act of employing an Alabama resident to perform services not within the state, under a contract executed elsewhere which expressly states that the parties intend to be governed, not by Alabama law, but by the law of the place of employment (Saudi Arabia)[and that to hold otherwise] would be totally inconsistent with the United States Constitution." *Id.*, 802 F.2d at 420-21.

Similar to the defendants in *Johnston*, the mere fact that CTSA and RMH attempted to negotiate and discuss terms of employment with Gitter does not itself establish sufficient minimum contacts to justify this court's exercise of *in personam* jurisdiction over them.  While some limited contacts, such as Dr. Hahn's observation of Gitter's surgical work and discussion of prospective employment in December 2006 and Dr. Robertson's follow up dinner visit with Gitter and his wife in January 2007, occurred in Alabama, key points during the process, including Gitter's interview trips to Richmond and Harrisonburg in October 2006 and February 2007, respectively, took place in Virginia.

Moreover, the terms of the Employment Agreement calls for Gitter to perform surgical services in Virginia.  Therefore, the "future consequences which themselves are the real object of the business transaction" are tied not to Alabama, but rather to

Virginia.  *See Sea Lift*, 792 F.2d at 993 (internal quotations and citations omitted).

Additionally, the contract further provides that the laws of Virginia govern its interpretation.  While a choice of law provision is not determinative of the minimum contacts issue, as advised in *Burger King*, such a provision should not "be ignored in considering whether a defendant has purposefully invoked the benefits and protections of a State's laws for jurisdictional purposes."  471 U.S. at 482 (internal quotations omitted).  Therefore, the court concludes that the forum with a series of substantial connections to the Employment Agreement and a demonstration of purposeful availment from both a retroactive and prospective view is Virginia, rather than Alabama.

Also comparable to the defendants in *Johnston*, neither RMH nor CTSA "resides in, is licensed to do business in, or does business in Alabama.  Neither has an office, telephone listing, post office box or street address in Alabama.  No bank accounts are maintained in Alabama.  The defendants have no customers in Alabama and derive no income from within the state. Neither owns or leases any real property in Alabama."  *Id.*, 802 F.2d at 420; *see also Aeropower*, at *12-13 (listing examples of defendants' lack of presence in forum state and determining that insufficient evidence exists to "support a finding of purposeful activity invoking the benefits and protections of Alabama").  Therefore, the overall quality and the nature of

Defendants' contacts with Alabama are limited at best and do not meet the prongs of purposeful availment or a reasonable expectation that those contacts would cause them to be sued in Alabama. Accordingly, the court concludes that the exercise of personal jurisdiction over Defendants fails to satisfy factors two and three of the *Vermeulen* minimum contacts criteria.[7]

### 2. The Fair Play and Substantial Justice Requirement

Even if minimum contracts criteria were satisfied in this instance, the court would still decline to exercise personal jurisdiction over RMH or CTSA because of the relevant considerations under the fair play and substantial justice requirement. "In evaluating whether the exercise of jurisdiction comports with fair play and substantial justice, the court must consider such factors as (1) the burden on the defendant, (2) the forum State's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies."

---

[7]Similar to the *Aeropower* decision, "[h]aving found no purposeful availment, the court pretermits full analysis of the third prong of the *Vermeulen* analysis. However, it logically follows that because [RMH and CTSA] did not purposefully direct any activity at the forum state, their contacts are not "such that [they] could reasonably anticipate being haled into court [in Alabama]." *Aeropower*, 2007 WL 163082, *13 (citations and footnote omitted).

*Alfa Corp. v. Alfagres, S.A.*, 385 F. Supp. 2d 1230, 1237 (2005) (citing *Burger King*, 471 U.S. at 474-76).

The burden on RMH and CTSA to litigate this case in Alabama substantially outweighs any convenience interest attributable to Gitter's choice of forum, especially in light of his recent move outside of Alabama.  (*See* Doc. #20 at attached announcement dated July 17, 2007 ("Richard Gitter, M.D., an experienced cardiothoracic and vascular surgeon, has joined Mercy Medical Center—Sioux City.")).  At the hearing, counsel for Gitter confirmed that his client had in fact relocated to Iowa.[8]  Relatedly, Gitter's lack of an Alabama residency makes the forum's interest in the litigation weaker than if Gitter were still an instate resident. Similarly, given that the nature of the Employment Agreement calls for Gitter's provision of medical services outside of Alabama, Alabama's interest in adjudicating the dispute is not as strong as it would have been if the contract had contemplated his performance in Alabama.

---

[8]During the hearing, counsel for Gitter opined that the court's consideration of Gitter's move as part of the analysis was a form of punishment against him, given his obligation to mitigate his damages.  The court disagrees.  The cases clearly provide that a plaintiff's residency is a relevant fact to the judicial inquiry and that consideration of this information applies regardless of the underlying reason behind a mid-litigation relocation by the plaintiff.

Finally, at this juncture, nearly all the key witnesses,[9] including Gitter, live outside of Alabama, and most of them live in Virginia, which considerations point to Virginia (and not Alabama) as the most efficient venue for the resolution of this case. Therefore, this court alternatively concludes that it lacks personal jurisdiction over both RMH and CTSA on the basis of the factors under the fair play and substantial justice requirement.

## C.      Defendants' Alternative Requested Relief to Transfer Venue

Having determined that it lacks personal jurisdiction over RMH and CTSA, rather than dismiss the case, pursuant to § 1406(a) and in the interest of justice,[10] the court transfers venue of this litigation to the Eastern District of Virginia, where venue is proper.  The court's determination that it lacks personal jurisdiction is no bar to its transferring authority under § 1406(a).  *See Goldlawr, Inc. v. Heiman*, 369 U.S. 463,

---

[9]Potentially, there will be witnesses to Gitter's resignation of his hospital privileges with Trinity Medical Center, who reside in Alabama, assuming this fact is not admitted by Defendants.  (Doc. #12 ¶ 16).

[10]Section 1406(a) provides:

The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a).

23

466 (1962) ("The language of § 1406(a) is amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not.").   Accordingly, Defendants' request in their Motions for the alternative relief to transfer venue to the Eastern District of Virginia is will be **GRANTED**, and the case will be **TRANSFERRED** to the Eastern District of Virginia, Richmond Division.  All other portions of the Motions will be **DENIED**.

   **DONE** and **ORDERED** this 20th day of August, 2007.


**VIRGINIA EMERSON HOPKINS**
United States District Judge